The REPUBLIC OF the PHILIPPINES and National Power Corporation, Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Westinghouse International Projects Company, and Burns and Roe Enterprises, Inc., Defendants.

Civ. No. 88-5150.

United States District Court, D. New Jersey.

Sept. 14, 1990.

See also 714 F.Supp. 1362.

Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein by Alan Naar, Woodbridge, N.J., and Shaw, Pittman, Potts & Trowbridge by David J. Cynamon, Washington, D.C. for plaintiffs.

Shanley & Fisher by Raymond M. Tierney, Jr., Morristown, N.J., and Cravath, Swaine, & Moore by Richard Clary, David Boies, New York City, for defendant Westinghouse.

Stein, Mitchell & Mezines by Glenn A. Mitchell, Washington, D.C., for defendant Burns & Roe Enterprises, Inc.

## OPINION

DEBEVOISE, District Judge.

Pursuant to Fed.R.Civ.P. 72(a) and Local Rule 40(D)(4)(a), defendants Westinghouse Electric Corporation and Westinghouse International Projects Company ("Westinghouse") appeal portions of two of Magistrate Hedges' discovery orders.

## FACTS

In 1978 the Securities Exchange Commission ("SEC") began investigating Westinghouse for securities violations relating to alleged illegal payments made to obtain a contract with the Philippine government in connection with the Philippine Nuclear Power Plant project ("PNPP").

In response to the SEC's initial inquiries, Westinghouse hired the law firm of Kirkland and Ellis ("K & E") to conduct an internal investigation concerning Westinghouse's payments to its "Special Sales Representatives" ("SSR") connected with the PNPP project. After conducting an eight-month investigation from March until November of 1978, K & E prepared two letter reports of its findings. K & E disclosed its findings to the SEC orally in October and November of 1978, and also showed the SEC investigators one of these reports. Westinghouse did not give the SEC any of the documents it relied upon to support its summary reports.[1] Notwithstanding these disclosures, the SEC continued its investigation until April of 1983.

In April of 1980 the SEC served subpoenas on Herminio Disini ("Disini"), a Philippine national, suspected of being involved in illegalities with Westinghouse.[2] Disini's attorneys the law firm Baker & McKenzie ("B & M") entered into negotiations with Westinghouse and exchanged documents to provide a joint defense for Disini and Westinghouse. B & M entered into negotiations with SEC officers on Disini's behalf and

provided it with audits which traced funds paid to Disini's companies under the SSR agreement with Westinghouse. B & M hired an auditor, Robert Gray ("Gray") to conduct the investigation. Gray eventually prepared a report of his findings in what is known as the "Coopers & Lybrand" report. The agreement provided that SEC was not to copy or physically take custody of any audit report, and was to hold any reports it received in confidence. B & M also had an agreement with Westinghouse that Westinghouse would keep the Coopers & Lybrand report confidential.

In 1978 the Department of Justice ("DOJ") began its own investigation of Westinghouse's activities concerning payments it made to obtain business throughout the world. The DOJ ended its investigation after entering into a plea agreement with Westinghouse over payments Westinghouse made to obtain business in Egypt.

In 1986 the DOJ again began investigating Westinghouse concerning the same events that were part of its 1978 investigation. The DOJ sent Westinghouse a subpoena issued by a grand jury requesting that Westinghouse produce several documents including the K & E letter reports and all other documents prepared in relation to K & E's internal investigation. Although Westinghouse initially objected to the subpoena and moved to quash it, it eventually disclosed all the documents the DOJ requested. Westinghouse did however enter into a confidentiality agreement with the DOJ which stated that "among other things, ... the [DOJ] could review (but not keep copies of) attorney-client privileged and work product protected materials in the [K & E] files, provided that the information contained therein would not be disclosed to anyone outside of the [DOJ] and that disclosure of the [K & E] documents would not constitute a waiver of Westinghouse's work product and attorney-

---

1. Westinghouse voluntarily disclosed these documents, *i.e.,* it did not make a motion to quash any of the government's subpoenas which requested this information. It also did not argue that the documents were protected by either the attorney-client privilege or the work-product privilege.

2. Disini filed an amicus brief objecting to the production of a report prepared by auditors Coopers & Lybrand. Disini claims that the report is protected by the attorney work-product privilege.

client privileges." (Westinghouse brief, p. 5). The DOJ's investigation remains open to this date.

In 1987 the plaintiffs ("Republic"), which were conducting their own investigations into Westinghouse and Burns & Roe entered into an agreement with the DOJ to share information concerning those investigations. This agreement was called "The Agreement on Procedures for Mutual Legal Assistance." There is no indication that either party disclosed the shared information to a third/adversarial party.

During discovery the Republic requested that Westinghouse turn over the documents it had made available to the SEC and the DOJ. Westinghouse objected claiming that these documents were protected by both the work-product privilege doctrine, Fed.R.Civ.P. 26(b)(3), and attorney-client privilege. Without specifying which documents were protected by either or both doctrines Magistrate Hedges held that some of the documents were clearly protected by the attorney-client privilege and some were protected by the work-product privilege. After reading briefs prepared by both sides and hearing oral argument Magistrate Hedges ruled that Westinghouse waived its right to assert either privilege because it had disclosed the documents to third-parties. Magistrate Hedges based his decision on policy grounds stating that: "I am satisfied, at least in adversarial situations such as this, that once disclosure has been made to a government agency and a potential adversary, any confidentiality is lost by that disclosure, notwithstanding the private agreement between Westinghouse and the government." He then issued an order on May 24, 1990, which encompassed this holding:

25. All assertions of the work product doctrine and/or the attorney-client privilege by Westinghouse with respect to documents disclosed by Westinghouse to the Securities and Exchange Commission, the Department of Justice or the Internal Revenue Service are overruled on the ground that, at least in adversarial situations, once disclosure has been made to a government agency any privilege is lost, notwithstanding any confidentiality agreement between Westinghouse and the government. Westinghouse shall identify all documents listed on its Privilege Log which have been disclosed to the Department of Justice or the Securities and Exchange Commission and shall produce all such documents.

Magistrate Hedges then invited Westinghouse to appeal his holding because he believed that the issue needs to be resolved. Westinghouse appeals paragraph 25 of Magistrate Hedges' order.

Also during discovery Westinghouse sought to obtain the documents that the Republic shared with the DOJ. Magistrate Hedges reviewed all of these documents *in camera* and concluded that they were protected by the work-product privilege and that the privilege was not waived when the Republic disclosed the documents to the DOJ. Magistrate Hedges' based his holding on two factors: (1) that since the Republic and the DOJ were allies, the Republic's sharing of its information with the DOJ did not run contrary to the principles of the adversary system; and (2) it was highly unlikely that any adversary could obtain the information once it was disclosed. Westinghouse appeals Paragraph 10 of Magistrate Hedges' order which reads:

10. The Republic's assertion of the work product doctrine with respect to the documents described in Paragraphs 5 through 9 above is not waived by virtue of the Republic's disclosure of those documents to the Department of Justice pursuant to the terms of the (Amended) Agreement on Procedures for Mutual Legal Assistance. Disclosure of work product material to a government agency by an entity acting in common interest with the Government, as opposed to an entity in an adversarial position to the Government, does not constitute a waiver of any work product privilege.

## DISCUSSION

▇ Under 28 U.S.C. § 636(b)(1)(A) and Fed.R.Civ.P. 72(a) a magistrate's order is not reversible unless it is "clearly errone-

ous or contrary to law." See *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1120 (3d Cir.1986), *cert. denied*, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). In *Cipollone* the court stated that "Title 28 U.S.C. § 636(b)(1)(A) (1982) explicitly states that the district court may modify the magistrate's order only if the district court finds that the magistrate's ruling was clearly erroneous and contrary to law." A ruling is clearly erroneous when the reviewing court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "United States Magistrates have broad discretion when deciding discovery motions. Their determinations may be overturned only if there is an abuse of discretion or legal error." *National Gateway Telecom, Inc. v. Aldridge*, 701 F.Supp. 1104, 1119 (D.N.J.1988), *aff'd w/out opinion*, 879 F.2d 858 (3d Cir.1989).

### Attorney–Client Privilege

Westinghouse claims that the documents it shared with the DOJ and SEC are protected by the attorney-client privilege.

The attorney-client privilege exists to foster disclosure and trust between the attorney and the client. *In re Grand Jury Investigation (Sun Co.)*, 599 F.2d 1224, 1235 (3d Cir.1979), *citing*, Wigmore on Evidence § 2291, at 545. However, this privilege must be very narrowly construed because it "obstructs the search for truth" and because "its benefits, are, at best, 'indirect and speculative.'" *Id.* All courts which have addressed the question agree that once a party discloses information protected by the attorney-client privilege to an outside party the privilege is destroyed. *United States v. Rockwell International*, 897 F.2d 1255, 1265 (3d Cir.1990). However, as the Third Circuit acknowledged in *Rockwell*, courts are not in agreement over whether the privilege is destroyed when the outside party is the government. *Id.*

Two divergent lines of cases which address this question exist. The leading case in one of these lines is *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977), the case upon which Westinghouse relies to support its appeal. (Plaintiff corporation sought to protect internal investigation report it turned over to the SEC pursuant to a subpoena).[3]

*Diversified* holds that when a party discloses privileged information to the government, that the privilege waiver is "limited," only in its relation to the government. The party may assert the privileges in litigation it enters with any party other than the government. *Id.*, at 611. The court's only justification for this holding was that "to hold otherwise may have the effect of thwarting the developing procedures of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." *Id.*, at 611.

Although the Third Circuit specifically declined to address the issue of whether the attorney-client privilege is waived when a party discloses the information to a government employee, language in *In re Grand Jury, (Sun Co.)*, 599 F.2d at 1237, is helpful in determining the outcome of these motions.

In *Sun Co.* the Third Circuit specifically rejected the Eighth Circuit's reasoning in *Diversified*. As the court stated:

> Some courts and commentators have suggested that the control-group test discourages a corporation from conducting internal investigations. *See, e.g., Diversified Industries, Inc. v. Meredith*, supra, at 609; ... The short answer to this argument is that they have little choice, We do not doubt that the ability to conduct a confidential investigation would make "compliance with the complex laws governing corporate activity" more palatable ... we do doubt, however, that a corporation would risk civil or criminal liability under those complex laws by foregoing introspection. In our opinion,

---

**3.** Contrary to Westinghouse's arguments, the *en banc* opinion addresses the attorney-client privilege and not the work-product privilege.

the potential costs of undetected noncompliance are themselves high enough to ensure that corporate officials will authorize investigations regardless of an inability to keep such investigations completely confidential.... Moreover, having been alerted to the applicable rule, corporate officials will attempt to adapt their dealings with counsel to maximize both the confidentiality and the utility of their communications....

(citations omitted). *Id.* Although the Third Circuit was not addressing the specific issue in question in this motion, its rejection of the Eighth Circuit's argument indicates that it would not honor any argument which was premised on the Eighth Circuit's reasoning. Westinghouse bases its argument on *Diversified* and cases which have followed it. Given the Third Circuit's specific rejection of this reasoning, I cannot acknowledge any of Westinghouse's arguments concerning the attorney-client privilege.

There is other evidence in *Sun Co.* that The Third Circuit would not follow the *Diversified* line of cases. In *Sun Co.* the court stated that it had a preference for adopting the majority rule in determining which cases are protected by the attorney client privilege. "By adopting the majority approach, we would move the federal courts one step closer to a uniform rule, thereby facilitating such adaptation." *Sun Co.*, 599 F.2d at 1237.

The majority rule is that once a party discloses information which was once protected by the attorney-client privilege, then the privilege is waived. The District of Columbia Circuit has been the leader in articulating when the attorney-client privilege is waived. In *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982), the court held that since the attorney-client privilege is designed to protect communications between a client and an attorney, and required absolute secrecy, once the secrecy was broken, the privilege was lost. Any other holding would encourage a party to use the doctrine as a shield when it wished to keep information confidential, and a sword when it wished to disclose the information to

protect itself. "[T]he attorney-client privilege should be available only at the traditional price: a litigant who wishes to assert confidentiality *must* maintain genuine confidentiality." *Permian Corp. v. United States*, 665 F.2d 1214, 1222 (D.C.Cir.1981). *See also, In re Subpoenas Duces Tecum (Fulbright & Jaworski)*, 738 F.2d 1367, 1369–70 (D.C.Cir.1984) (waiver applies for all parties, both public and governmental, and to all documents regardless of whether they were turned over or merely disclosed); *Chubb Integrated Systems v. National Bank of Washington*, 103 F.R.D. 52, 65 (D.D.C.1984) (confidential agreement between government and parties is merely a contract between the parties, and cannot act to maintain the privilege as to third parties).

Thus, I find that Magistrate Hedges' ruling that if indeed Westinghouse's internal investigative report was protected by the attorney-client privilege, then this privilege was waived once Westinghouse disclosed its findings to the DOJ or the SEC.

*Work–Product Doctrine*

Fed.R.Civ.P. 26(b)(3), "the work product doctrine" states that:

... [A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of Litigation or for trial by or for another party ... only upon a showing that the party seeking discovery has substantial need of the materials ... In ordering discovery of such materials when the required showing has been made, *the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.*

The Third Circuit defined attorney work product broadly in *Sporck v. Peil*, 759 F.2d 312 (3d Cir.1985), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). In *Sun Co.*, 599 F.2d at 1228 the Third Circuit held that in deciding whether the work-product doctrine applies three questions must be examined:

First, were these materials collected or prepared in preparation for possible liti-

gation so as to qualify as 'work product'? Second, if they are entitled to protection as work product, is the protection afforded them absolute or qualified? Third, if the documents are entitled to only qualified protection, has the [party seeking discovery] made an adequate showing to overcome that protection?

The court also held that determining whether documents are protected by the work-product privilege should be done on a case-by-case basis. *Id.*

It is clear that the attorney work-product privilege is not absolute. As the United States Supreme Court held in *United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975):

[a]t its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system....

The privilege derived from the work product doctrine is not absolute. Like other qualified privileges, it may be waived.

In *Nobles* the Supreme Court held that an attorney who allowed his private investigator to testify as a witness waived the work-product privilege as it related to the matters covered in the investigator's testimony. Since *Nobles,* the Third Circuit has commented that the privilege may be waived in certain circumstances, although it has not given any indication of what those circumstances might be. *See, Appeal of Hughes,* 633 F.2d 282, 288 (3d Cir. 1980).

In this case, Magistrate Hedges did not examine Westinghouse's documents closely to determine whether they were protected by the work-product privilege. Instead, he held that the privilege was waived once Westinghouse voluntarily disclosed this information to its adversaries, the SEC and the DOJ. However, he did review all of the Republic's documents before concluding that they were protected by the work-product privilege. Although the Third Circuit has been silent as to when the work product privilege is waived, several appeals courts have decided this issue.

■ Courts agree that the work-product privilege is not waived as easily as the attorney-client privilege. This is because different policy reasons surround the two doctrines. The work-product doctrine exists to protect the adversary system, while the attorney-client privilege exists to protect confidentiality. Thus the work-product privilege is not instantly waived once the confidential information is disclosed, but rather only if a disclosure runs counter to the principles embodied by the adversary system. *In re Sealed Case,* 676 F.2d 793.

*Fulbright & Jaworski,* 738 F.2d 1367 is instructive in deciding these motions, because the facts in that case are strikingly similar to the facts surrounding Westinghouse's disclosures. In *Fulbright & Jaworski* the law firm of Fulbright & Jaworski ("F & J") conducted an internal investigation into a company, Tesoro's illegal payments to foreign officials. Tesoro hired F & J to conduct this investigation after it received a subpoena from the SEC. Under the SEC's "voluntary disclosure" program Tesoro disclosed the results of the F & J investigation. Based on these disclosures the SEC filed a formal complaint against Tesoro. The SEC then reported the matter to the DOJ, which in turn began its own investigation. Pursuant to that investigation the DOJ issued a subpoena to Tesoro for the materials it turned over to the SEC. Tesoro asserted the work-product privilege to protect the F & J report and argued that any waiver of the privilege was limited exclusively to the SEC and that no other party could have access to the information. The D.C. Circuit held that the privilege was waived for all parties. The court based its reasoning on theories of fairness and on the principles behind the work-product privilege. The court held that since the purpose of the privilege was to protect the adversary process, once that process was destroyed by disclosure of information to one adversary, so was the privilege. Quoting *In re Sealed Case,* 676 F.2d at 822–23 the court held:

We are convinced that the health of the adversary system—which spawned the need for protection of an attorney's work product from discovery by an opponent—would not be well served by allowing appellants the advantages of selective disclosure to particular adversaries, a deferential disclosure often spurred by considerations of self-interest. "When a corporation elects to participate in a voluntary disclosure program like the SEC's, it necessarily decides that the benefits of participation outweigh the benefits of confidentiality for all files necessary to a full evaluation of its disclosures. It forgoes some of the traditional protections of the adversary system in order to avoid some of the traditional burdens that accompany adversary resolution of disputes, especially disputes with such formidable adversaries as the SEC."

The court also believed that it was significant that the disclosure was made voluntarily, i.e., not pursuant to any subpoena. "The distinction between voluntary disclosure and disclosure by subpoena is that the latter, being involuntary, lacks the self-interest which motivates the former." *Id.*, at 1372.

Even though the D.C. Circuit partially based its holding on the fact that Tesoro and the SEC had not entered into confidentiality agreements, in *Chubb*, 103 F.R.D. at 67, the D.C. district court held that a voluntary disclosure in a separate but related proceeding is a waiver of the work-privilege doctrine even if the parties agree to keep the disclosed information confidential. The court held that

> [t]he agreement between [the parties] does not alter the objective fact that the confidentiality has been breached voluntarily. The agreement is for the mutual convenience of the parties.... That agreement is merely a contract between the two parties to refrain from raising the issue of waiver or from otherwise utilizing the information disclosed.

Plaintiff has no genuine claim of confidentiality to the documents it produced [for one of its adversaries].

*Id.* Since the purpose behind the work-privilege doctrine is to maintain a healthy adversary system, it would not be fair to use it in a way that is not consistent with the adversarial system. *Id.* Thus, once information is disclosed to an adversary, any adversary, a future adversary in a related proceeding may have access to the information. *Id.*

Even the Eighth Circuit, is in accord with these cases, despite its very different reasoning concerning the attorney-client privilege as articulated in *Diversified.* In *In re Chrysler Motors Corporation Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir.1988), held that when a party discloses its work product in the course of any adversarial proceeding, even in the course of signing a settlement agreement, the party waives its right to assert that privilege against *any other party. Id.*, at 846. The Court reasoned that any privileged information revealed during the course of an adversarial proceeding loses its special protection forever. In reaching its conclusion, the Eighth Circuit cited to several District of Columbia cases decided *after* its *Diversified* holding, including *Chubb.*[4]

■ Since the work-product privilege doctrine is based on maintaining a healthy adversarial system, I agree with the courts which have held that once the privileged information is disclosed to any adversary the privilege is destroyed.

■ However, contrary to Westinghouse's assertion, the same does not hold true when a party discloses information to an ally. *Shulton Inc. v. Optel Corp.*, No. 85–2925, 1987 W.L. 19491 (D.N.J. Nov. 4, 1987) (Sarokin, U.S.D.J.), this court's unpublished opinion, supports this finding and is consistent with the cases discussed above. The facts in this case surrounding

**4.** The Third Circuit has not had the opportunity to address these issues. *Jaroslawicz v. Engelhard Corp.*, 115 F.R.D. 515 (D.N.J.1987), which Westinghouse cites does not address the issue of waiver, but rather only discusses under what situation the work-product privilege applies. At 517, and n. 12.

 

the Republic's relationship with the DOJ are similar to the facts in *Shulton*. In *Shulton* this court held that a corporation did not waive its right to assert the work-product privilege when it cooperated with the government to secure an indictment for a mutual adversary. Disclosing information to an ally may strengthen, rather than destroy, the adversary process, as allies who fortify their cases against their mutual adversary have a greater chance of defeating that adversary. The relationships between Westinghouse and Disini and the DOJ and SEC are very different from those between the parties in *Shulton* and the Republic with the government. Thus the plaintiff and defendant in this case are entitled to different protections under the work-product privilege doctrine.

However, I do not agree with *Shulton*'s holding that one of the factors used in determining whether the work-product privilege is waived is the likelihood that the information will be disclosed to another adversary. Using this as a guiding principle runs contrary to the adversary system, and allows parties to enter into sweetheart deals with their adversaries where they can evoke the privilege when it suits them. It is unnecessary in the present case to determine what the effect would be if either of the cooperating parties disclosed the shared privileged or work product material to a third party or adversary.

Thus, I will affirm both of Magistrate Hedges' orders.

## CONCLUSION

For the reasons discussed above I find that Judge Hedges' holdings, that Westinghouse waived its right to assert the work-product and attorney-client privileges when it voluntarily disclosed information to the SEC and the DOJ, and that the Republic did not waive its right to assert the work-product privilege when it shared information with the government, are not clearly erroneous, and correctly apply legal principles. I will enter an appropriate form of order.

## ORDER

This matter having been brought before the Court by defendants Westinghouse Electric Corporation and Westinghouse International Projects Company on a motion appealing two orders entered by Magistrate Hedges, the Court having reviewed all written and oral arguments, and for good cause, and for the reasons set forth in an opinion of even date,

IT IS on this 14th day of September 1990

ORDERED that the defendants' motions are DENIED.

Magistrate Hedges' holdings are not clearly erroneous and correctly apply legal principles.